IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ST. LUKE'S EPISCOPAL HOSPITAL,   §
                                 §
          Plaintiff,             §
                                 §
v.                               §        CIVIL ACTION NO. H-05-1438
                                 §
ACORDIA NATIONAL and             §
KNUST SBO,                       §
                                 §
          Defendants.            §

## MEMORANDUM AND OPINION

St. Luke's Episcopal Hospital admitted and treated Rachel Galvan, a beneficiary of

a medical insurance plan provided through Knust SBO, her husband's employer. The Knust

Plan is an ERISA-regulated plan. Acordia National, an insurance company and health

maintenance organization, served as the Claims Administrator for the Knust Plan. Galvan

assigned her Knust Plan benefits for the medical services she received to St. Luke's. After

St. Luke's billed Acordia for the costs of Galvan's care, Acordia denied payment. St. Luke's

sued Acordia and Knust in Texas state court, alleging state-law causes of action for

misrepresentations relating to the Plan benefits, in violation of the Texas Insurance Code and

Deceptive Trade Practices Act; for negligence in precertifying coverage for Galvan's

hospitalization and in investigating and processing St. Luke's payment claim; and for breach

of contract in failing timely to pay for the services provided. The contract allegedly breached

is a managed-care contract between St. Luke's as a participating health care provider and

Houston Healthcare Purchasing Organization, Inc. dba PPO Next, which in turn entered into a "Payor Agreement" with Knust.  Acordia and Knust removed on the ground that ERISA preemption provided federal jurisdiction.  St. Luke's filed a motion to remand.  (Docket Entry No. 3).  A different judge of this court adopted the magistrate judge's memorandum and recommendation to deny St. Luke's motion to remand.  (Docket Entry No. 31).  After the district judge recused, the case was transferred and St. Luke's moved for reconsideration of the denial of its remand motion. (Docket Entry No. 44).  Defendants responded.  (Docket Entry No. 52).  This court heard argument and received supplemental briefs and documents, including copies of the Knust Plan and of the managed-care contract.  (Docket Entry No. 54).[1]  After reviewing the motions and responses, the pleadings, and the applicable law, this court denies St. Luke's motion for reconsideration.  The reasons are explained below.[2]

## I.    Background

As noted, Rachel Galvan's husband worked for Knust, which offered a medical insurance plan to its employees and their spouses.  It is undisputed that the Plan is subject to ERISA and that Acordia serves as Plan Administrator.  29 U.S.C. § 1002(1); (Self-Insured Welfare Benefit Plan Adoption Agreement between Knust and Acordia, Docket Entry No.

---

[1]  Acordia has also filed a motion to dismiss certain of St. Luke's claims, (Docket Entry No. 36), to which St. Luke's responded, (Docket Entry No. 55), and Acordia replied, (Docket Entry No. 56).

[2]  The motion before this court is a motion to reconsider the now-recused district judge's order adopting the magistrate's memorandum and recommendation.  The result is the same whether this court applies the motion for reconsideration standard, the *de novo* review standard applicable to a magistrate judge's memorandum and recommendation, or the requirement that a federal court assure itself of its jurisdiction at all stages of a case.  The analysis focuses on the ERISA preemption standards.

59).  In June 2004, Rachel Galvan was hospitalized at St. Luke's for an extended period.  In its pleadings, St. Luke's alleged that before it admitted Galvan, a St. Luke's representative telephoned an Acordia representative and received oral representations from Acordia that Galvan was covered under the Knust Plan and a summary of benefits under the Plan.  In its answer, Acordia and Knust deny any misrepresentation and assert that the telephone conversation included a disclaimer that the summary of benefits did not guarantee payment and that the information only applied to procedures and diagnoses covered under the Plan. (Docket Entry No. 35, ¶ 11).

In 1997, St. Luke's entered into a Facility Service Agreement with Houston Healthcare Purchasing Organization, Inc. dba PPO Next.  St. Luke's is a "participating provider" of "Covered Services" under the Facility Service Agreement.  (Docket Entry No. 58, § 2.4).  In this Agreement, St. Luke's gave discounted rates for medical services provided to participants in plans that agreed to purchase health care services.  PPO Next entered into "Payor Agreements" with these purchasers of "Covered Services on behalf of Eligible Persons."  (*Id*. at § 2.5).  Under the "Payor Agreements" with PPO Next, "Participating Providers" such as St. Luke's provide "Covered Services" to participants and beneficiaries of the subscribing health care benefit plans.  (*Id*. at § 2.6).  "Covered Services" is defined to mean "the health care services provided pursuant to a Plan."  (*Id*. at § 2.3).  A Participating Provider agrees to furnish "Eligible Persons" with "Medically Appropriate" "Covered Services"; the Payor or its agent agrees to pay the Participating Provider "pursuant to the terms of the applicable Plan" the lesser of the Participating Provider's customary charges or

3

the amounts set out in the Agreement's "Maximum Reimbursement Schedule" for "Covered Services furnished to Eligible Persons pursuant to such Plan." (*Id.* at ¶ 2). An "Eligible Person" is a person "entitled to receive the "Covered Services pursuant to a Plan." (*Id.* at § 2.2).

Under the Facility Service Agreement, St. Luke's agreed to provide "Covered Services" to "Eligible Persons" under the Knust Plan. The Claims Administrator for the Knust Plan in turn agreed to pay for "Covered Services" provided to "Eligible Persons" at the rates and within the time periods specified in the Facility Service Agreement. If a payor—such as defendants—failed to meet the time deadlines for payments, the right to discounts set out in the Agreement is forfeited and the regular charges apply.

St. Luke's submitted bills for Galvan's treatment totaling $221,210.75 to Acordia. In turn Acordia forwarded the bills to PPO Next to be repriced and discounted under the Facility Service Agreement. PPO Next allegedly received the bills on August 3, 2004. Under the Facilities Service Agreement, PPO Next reduced the bills to the discounted amount of $173,491.00 and forwarded the repriced invoice to Acordia for payment. Acordia eventually refused to pay any of the billed amount on the basis that the services were not covered because of the preexisting condition exclusion in the Plan.[3] The Plan defined a "Pre-Existing Condition" and provided, in relevant part, that "expenses incurred for treatment of

---

[3] The Plan defined a "Pre-Existing Condition" as "An Injury or Sickness or any related condition present before the Enrollment Date, whether or not any medical device, diagnosis, care or treatment was recommended or received before the Enrollment Date; provided, however genetic information shall not be treated as a Pre-Existing Condition in the absence of a diagnosis of the Condition related to such information." (Docket Entry No. 59, § 3.82).

a Pre-Existing Condition shall be excluded from coverage under the Plan and not considered Covered Medical Expenses if medical advice, diagnosis, care or treatment was recommended or received with respect to such Pre-Existing Condition within the six (6) month period ending on the Participant's Enrollment Date. . . ." The provision limited the time that the preexisting condition exclusion would apply. (Docket Entry No. 59, § 4.6A).

St. Luke's sued Acordia and Knust in Texas state court, asserting three causes of action. The first is a claim that the defendants violated the Texas Insurance Code, Article 21.21, §§ 4 and 16 and the Texas Deceptive Trade Practices Act, TEX. BUS. & COMM. CODE § 17.46, by misrepresenting that Galvan was covered under the Plan and the managed-care contract before the hospitalization, and by making misrepresentations about the status of the payment after the invoices were submitted. The second cause of action asserts that the defendants were negligent in investigating whether Galvan was covered and in investigating the payment claims. The third cause of action asserts that the defendants breached the managed-care contract with PPO Next and violated Articles 20A.18B, 3.70, and 21.55 of the Texas Insurance Code by failing to pay St. Luke's the amounts due in a timely fashion.

The defendants removed, claiming complete preemption under ERISA. St. Luke's moved to remand, asserting that its state-law claims were based on the managed-care contract, not the ERISA Plan, and on common-law and statutory claims that do not arise from or affect rights under ERISA. The magistrate judge recommended that the district court deny the motion to remand on the ground that the breach of contract claim was completely preempted by ERISA under the test enunciated in *Aetna Health, Inc. v. Davila*, 542 U.S. 200

(2004).  (Docket Entry No. 26).  The then-presiding judge adopted this recommendation. (Docket Entry No. 31).  St. Luke's has filed a motion for reconsideration of that decision, (Docket Entry No. 44), and the defendants have filed a motion to dismiss certain claims, (Docket Entry Nos. 36, 37).

## II.    The Legal Standards

### A.    ERISA Preemption

A civil action filed in state court is removable to federal court if the claim is one "arising under" federal law.  28 U.S.C. §§ 1331, 1441(a).  Under the "well-pleaded complaint" rule, the plaintiff is generally entitled to remain in state court if the complaint does not affirmatively allege a federal claim on its face.  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6  (2003).  To support removal, a right or immunity created by the Constitution or federal law must be an essential element of the plaintiff's cause of action.  *Id*. (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal*., 463 U.S. 1, 10–11 (1983)).

An exception to the well-pleaded complaint rule allows removal if the case "falls within the narrow class of cases to which the doctrine of 'complete preemption' applies." *Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 398 (2004), *cert. denied*, 126 S. Ct. 336 (2005) (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004)).  "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Id*.  "When the federal statute completely pre-empts the state-law cause of action, a claim which comes

6

within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Anderson*, 539 U.S. at 8.

Section 514(a) of ERISA expressly preempts all state laws "insofar as they may now or hereafter relate to any employee benefit plan."  Section 502(a) of ERISA, the statute's civil-enforcement provision, provides that a "civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan. . . ."  29 U.S.C. § 1132(a).  This provision has "such 'extraordinary pre-emptive power' that it 'converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " *Pascack Valley Hosp.*, 388 F.3d at 399–400 (quoting *Davila*, 542 U.S. at 209).  State-law actions within the scope of § 502(a) are recharacterized as federal claims and are removable to federal court.  *Pascack Valley Hosp.*, 388 F.3d at 399–400 (citations omitted); *Caterpillar, Inc. v. Williams*, 482 U.S. 386 (1987) ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.").  The recharacterization of a plaintiff's state-law claims provides a basis for federal removal jurisdiction.  *Heimann v. Nat'l Elevator Indus. Pension Fund*, 187 F.3d 493, 499 (5th Cir. 1999).

The fact that a given federal law might "apply" or provide a federal defense to a state-law cause of action is insufficient to establish federal question removal jurisdiction.  Complete preemption is required.  *See Franchise Tax Bd.*, 463 U.S. at 23–24.  "In complete preemption a federal court finds that Congress desired to control the adjudication of the

7

federal cause of action to such an extent that it did not just provide a federal defense to the

application of state law; rather, it replaced the state law with federal law and made it clear

that the defendant has the ability to seek adjudication of the federal claim in a federal forum."

14B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3722.1 (3d ed.

1998).   To establish federal question jurisdiction through the invocation of a federal

preemption defense, the defendant must demonstrate that Congress intended not just to

"preempt a state law to some degree," but to altogether substitute "a federal cause of action

for a state cause of action."   *Schmeling v. NORDAM*, 97 F.3d 1336, 1341 (10th Cir. 1996).

### B.   *Davila* and Subsequent Case Law on ERISA Preemption

The Supreme Court's most recent analysis of ERISA preemption, *Aetna Health Inc.

v. Davila*, 542 U.S. 200 (2004), involved consolidated cases in which a participant and a

beneficiary sued their  HMOs for alleged failures to exercise ordinary care in the handling

of coverage decisions, allegedly violating the Texas Health Care Liability Act (THCLA).

Davila's claim arose out of his HMO's refusal to pay for Vioxx after it was prescribed by his

treating physician.   *Id.* at 204–05.   Calad's claim arose from her HMO's refusal to pay for

an extended hospital stay despite her physician's recommendation that she remain

hospitalized after surgery.   *Id.* at 205.   The Supreme Court was asked to decide whether

ERISA's civil enforcement provision completely preempted these state-law claims.

The Court stated:

> If a participant or beneficiary believes that benefits promised to
> him under the terms of the plan are not provided, he can bring
> suit seeking provision of those benefits.   A participant or

> beneficiary can also bring suit generically to "enforce his rights" under the plan, or to clarify any of his rights to future benefits. Any dispute over the precise terms of the plan is resolved by a court under a de novo review standard, unless the terms of the plan "giv[e] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."
>
> It follows that if an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls within the scope of ERISA § 502(a)(1)(B). . . .   In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).

*Davila*, 542 U.S. at 210 (internal quotation and citation omitted).  Applying this standard, the Supreme Court concluded that both plaintiffs' claims involved the denial of coverage allegedly promised under their respective ERISA-regulated benefit plans.  The Court held that these state-law claims were completely preempted by § 502(a)(1)(B) of ERISA. "Congress' intent to make the ERISA civil enforcement mechanism exclusive would be undermined if state causes of action that supplement the ERISA § 502(a) remedies were permitted, even if the elements of the state cause of action did not precisely duplicate the elements of an ERISA claim."  *Id*. at 216.  The Court concluded that the claims were preempted despite the fact that they were state-law tort claims, based on an external state statutory duty, and did not duplicate ERISA remedies.  *Id*.  The *Davila* Court's test for

preemption asks whether:  (1) the plaintiff, at some point in time, could have brought its claim under ERISA § 502(a)(1)(B); and (2) there is no legal duty independent of ERISA or the plan terms implicated by the defendant's actions.  *Id.* at 210.

Since *Davila*, several courts of appeals have analyzed preemption of claims not only by plan participants or beneficiaries, but also by third-party health-care providers.  In *Cleghorn v. Blue Shield of California*, 408 F.3d 1222 (9th Cir. 2005), the court considered a plan participant's claims arising out of his ERISA insurer's refusal to reimburse him for emergency medical care.  The insurer based its denial on plan terms that required physician preauthorization for emergency care.  The plaintiff alleged that the preauthorization requirement violated California state statutes.  The appellate court affirmed the district court's preemption finding, emphasizing that "[t]he only factual basis for the relief pleaded in [the] complaint is the refusal of Blue Shield to reimburse [plaintiff] for the emergency medical care he received.  Any duty or liability that Blue Shield had to reimburse him 'would exist here only because of [Blue Shield's] administration of ERISA-regulated benefits plan. . . . [Plaintiff's] claim therefore cannot be regarded as independent of ERISA."  408 F.3d at 1226.

The Third Circuit was faced with an assertion of § 502(a) preemption in *Pascack Valley Hospital, Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393 (3d Cir. 2004).  The plaintiff in that case, as in the present case, was a hospital that had agreed to accept discounted payment for medical services provided to subscribing health plans' participants and beneficiaries.  The hospitals, including the plaintiff, did not contract directly

with the plans, but instead entered into individual contracts with a preferred provider organization similar to PPO Next, which in turn entered into agreements with the various plans similar to the "Payor Agreements" in the present case. The agreements in *Pascack*, as in the present case, provided that the ERISA-regulated plans had to remit payment to the hospital for "covered services" rendered to "eligible persons" within a certain period or the discounted rate for those services would be forfeited. 388 F.3d at 396.

The underlying dispute in *Pascack* arose from medical services provided to two individuals who were eligible for coverage under the defendant ERISA plan. The treating hospital submitted claims for payment for those services. The defendant plan paid based on the discounted rate. The hospital sued the plan for alleged breach of the managed-care agreement on the theory that the plan's payments had been made after the limited time period allowed and had been improperly discounted. The plan removed the suit to federal court and the hospital moved to remand. The question facing the court of appeals was whether the hospital's claims were completely preempted by § 502 of ERISA, making removal proper.

The Third Circuit began its analysis with the *Davila* test. The case was removable "only if (1) the Hospital could have brought its breach of contract claim under § 502(a), and (2) no other legal duty support[ed] the Hospital's claim." *Pascack Valley Hosp.*, 388 F.3d at 400. The court first concluded that the hospital, being neither a "participant" nor a "beneficiary" under the plan, could not have brought its claims under ERISA. The court declined to resolve whether, as a matter of law, the hospital could have obtained § 502(a) standing by virtue of an assignment from the participant or beneficiary because there was no

11

evidence indicating that, in fact, such an assignment had occurred.  *Id.* at 400–01.  The court noted, however, that "[a]lmost every circuit to have considered the question has held that a health care provider can assert a claim under § 502(a) where a beneficiary or participant has assigned to the provider that individual's right to benefits under the plan."  388 F.3d at 401 n.7 (citing *Tango Transport v. Healthcare Fin. Servs.*, 322 F.3d 888, 891 (5th Cir. 2003) (collecting cases)).

The court of appeals next concluded that the hospital's state-law claims were predicated on a legal duty independent of ERISA.  The court acknowledged that the hospital's claims derived from an ERISA plan and existed "only because" of that plan.  *Id.* at 402 (quoting *Davila*, 542 U.S. at 210).  The "crux" of the dispute, however, was the meaning of § 2.1 of the Subscriber Agreement, which governed the rates of payment for "Covered Services furnished to Eligible Persons."  The court noted that if the parties had disputed coverage and eligibility, "interpretation of the Plan might form an 'essential part' of the Hospital's claims."  *Id.* at 402.  The record did not support that view of the dispute, leading the court to conclude that resolution of the lawsuit would require interpretation of the managed-care contract, not the ERISA Plan.  "The Hospital's right to recovery, if it exists, depends entirely on the operation of third-party contracts executed by the Plan that are independent of the Plan itself."  388 F.3d. at 402.

The *Pascack Valley Hospital* court found instructive the decision of the Ninth Circuit Court of Appeals in *Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.*, 187 F.3d 1045 (9th Cir. 1999).  In that case, the court held that claims asserted by health

care providers against a health care plan for breach of their provider agreements were not completely pre-empted under ERISA. *Id.* at 1047. The court reached this conclusion even though the medical providers had obtained assignments of benefits from beneficiaries of the ERISA-covered health care plans. *Id.* at 1052.

The litigation in *Anesthesia Care* arose from a fee dispute between four health care providers and Blue Cross, which had entered into "provider agreements" with physicians. Under those agreements, Blue Cross agreed to identify the providers in the information it distributed to beneficiaries of the plan and to direct beneficiaries to those providers. In return, the providers agreed to accept payment for services rendered to beneficiaries according to specified fee schedules. When Blue Cross attempted to change the fee schedules, the providers filed a class action in state court alleging a breach of the provider agreements. *Id*. at 1049. The Ninth Circuit held that "the Providers' claims, which arise from the terms of their provider agreements and could not be asserted by their patient-assignors, are not claims for benefits under the terms of ERISA plans, and hence do not fall within § 502(a)(1)(B)." *Id*. at 1050. The court explained:

> [T]he Providers are asserting contractual breaches . . . that their patient-assignors could not assert: the patients simply are not parties to the provider agreements between the Providers and Blue Cross. The dispute here is not over the right to payment, which might be said to depend on the patients' assignments to the Providers, but the amount, or level, of payment, which depends on the terms of the provider agreements.

*Id*. at 1051 (first emphasis added). Because the providers asserted "state law claims arising out of separate agreements for the provision of goods and services," the court found "no basis

to conclude that the mere fact of assignment converts the Providers' claims into claims to recover benefits under the terms of an ERISA plan." *Id*. at 1052.

The Third Circuit found important similarities between the facts in *Pascack Valley Hospital* and those involved in *Anesthesia Care Associates*: "(1) the Hospital's claims in [*Pascack Valley Hospital*] arise from the terms of a contract—the Subscriber Agreement—that is allegedly independent of the Plan; (2) the participants and beneficiaries of the Plan do not appear to be parties to the Subscriber Agreement; and (3) '[t]he dispute here is not over the right to payment, which might be said to depend on the patients' assignments to the [Hospital], but the amount, or level, of payment, which depends on the terms of the [Subscriber Agreement].' " 388 F.3d at 403–04 (quoting *Anesthesia Care Assocs. Med. Group, Inc*., 187 F.3d at 1051) (alterations and emphasis in original).

In *Land v. Cigna Healthcare of Florida*, 381 F.3d 1284 (11th Cir. 2004), the Eleventh Circuit considered a case remanded for reconsideration in light of *Davila*. *Land* involved a plan participant's suit against his ERISA plan administrator, alleging negligence in the care and treatment of an illness. The circuit had initially remanded to state court, finding that under *Pegram v. Herdrich*, 530 U.S. 211 (2000), the plan's refusal to authorize inpatient treatment and instead to cover only outpatient treatment was a "mixed" eligibility and treatment decision. The circuit court also found remand supported on the basis that the plaintiff asserted a tort claim based on the duty of care rather than a contract claim to recover plan benefits. On remand from the Supreme Court, the Eleventh Circuit held that ERISA § 502(a)(1)(B) completely preempted the state-law causes of action, making the lawsuit

14

removable to federal court.  The court found this result compelled by *Davila*'s holding that "the duties imposed by state law regarding the handling of coverage decisions did not arise independently of ERISA or the terms of the plans in question."  381 F.3d at 1274.

Several district court cases have also recognized the distinction between a dispute over the right to payment—that is, coverage and eligibility—which derives from the patient and depends on ERISA or on ERISA-regulated plan terms, and a dispute over the amount or level of payment, which depends on the terms of the managed-care contracts.  In *UPMC Presby Shadyside v. Whirley Industries, Inc*., No. 1:05-CV-68, 2005 WL 2335337 (W.D. Pa. Sept. 23, 2005), the court considered a hospital's claim that its bills for treating a participant in an ERISA plan were improperly discounted, in breach of the managed-care contract.  The hospital received partial payment for the amounts billed and filed suit to collect the remainder.  The hospital contended that, in taking the allegedly improper discounts, the defendants breached the terms of a "Memorandum of Understanding" ("MOU") between the hospital and a preferred provider organization.  The hospital alleged that the provider claimed two categories of improper discounts: "prompt payment discounts" and discounts based on services priced in excess of what is "reasonable and customary."

As to the first category, the court found that the claim was not preempted under *Pascack Valley Hospital*.  The court determined that, as in *Pascack Valley Hospital*, the plaintiff's breach of contract claims arose only because the hospital treated a patient covered by an ERISA plan.  *Id.* at *6.  The "crux" of the "prompt payment" dispute, however, centered on the MOU.  The "prompt payment" discount rubric was part of the MOU, not the

ERISA plan.  The court concluded that the "prompt payment" dispute depended "entirely on the operation of an agreement independent of the Plan itself."  *Id.*  Like in *Pascack Valley Hospital*, the insured in question was never a party to the MOU and could not have asserted the "prompt payment" discount breach of contract claims under ERISA.  At bottom, the "prompt payment" dispute was "not over the right to payment (i.e., coverage and eligibility under the Plan are not in dispute), but the amount or level of payment, which depends on the terms of the MOU."  *Id.* (citing *Pascack Valley Hosp.*, 388 F.3d at 403–04 (additional citations omitted)).  The court held that ERISA § 502(a)(1)(B) did not preempt the "prompt payment" breach of contract claim.

As to the second category of allegedly improper discounts, the court again found no preemption.  The court noted that, as framed by the complaint, the issue was not whether, in fact, the hospital's charges were "reasonable and customary" within the meaning of the Plan, but whether the defendants complied with the MOU's procedure for discounting UPMC's charges on this basis.  2005 WL 2335337, at *7.  The legal duties that the hospital claimed were breached derived not from the ERISA plan, but from the terms of the MOU, because the hospital claimed that defendants had breached the MOU limits on audits, which were restricted to verifying charges and could not be used to establish reasonableness.  Viewed in that light, they were not claims that could be asserted by the plan participant or beneficiary under § 502(a)(1)(B) of ERISA.  The court concluded by emphasizing the third factor discussed in *Pascack Valley Hospital*:

> There does not appear to be any serious dispute here that the [ ]
> employee in question was eligible to receive benefits under
> the . . . plan and that the services received through [the hospital]
> were covered by the plan.  Thus, as was the case in *Pascack
> Valley Hospital*, the dispute here "is not over the right to
> payment, which might be said to depend on the patient['s]
> assignment[ ] to the Hospital, but the amount, or level of
> payment.

388 F.3d at 403–04.  The court remanded the *Whirley Industries* case.

In *Tenet Healthsystem Hospitals, Inc. v. Crosby Tugs, Inc.*, No. Civ. A. 04-1633, 2005
WL 1038072 (E.D. La. Apr. 27, 2005), the court considered a motion to remand filed by a
hospital against an ERISA plan.  The hospital was a party to a managed-care contract similar
to the contract at issue in *Pascack Valley Hospital*, *Whirley Industries*, and in the present
case.  The plan in that case paid part of the charges billed, but did not pay the entire amount.
The court granted the motion to remand, emphasizing that the dispute was over the
"applicable *rate* of payment," which was set out in the managed-care contract, rather than
whether the "*services* themselves were usual, customary, reasonable, medically necessary,
or otherwise 'covered' under the [ERISA plan]."  *Id.* at *8 (emphasis in original).

Another district court in this circuit has recognized the distinction between
independent claims predicated on managed-care agreements, which are not preempted, and
claims that, while touching on managed-care agreements, nevertheless are not independent
of underlying ERISA plans.  In *Radiology Associates of San Antonio, P.A. v. Aetna Health,
Inc.*, No. CIVASA03CA1152RF(NN), 2005 WL 578150 (W.D. Tex. Mar. 2, 2005), the court
reconsidered an earlier decision remanding a health-care provider's breach of contract claim

17

against an insurance company.  In examining the managed-care contract, the court noted that, as in this case, much of the managed-care contract incorporated the ERISA Plan by reference.  *Id.* at *7 n.76 ("Company contracts with health care providers to render services to individuals entitled to receive health care service from or through a Plan; . . . Group shall provide to Members . . . those Covered Services . . . Those Medically Necessary Services which a Member is entitled to receive under the terms and conditions of a Plan") (internal citations omitted).  The court concluded that "[b]ecause the entire scope of the parties' agreement is determined by the ERISA-regulated plan, the parties' agreement is tethered to the ERISA-regulated plan.  The contract, therefore, is not 'independent' and does not establish the kind of 'independent legal duty' contemplated by *Davila*."  *Id.* at *7 (quoting *Davila*, 542 U.S. at 210).

*Davila* overruled a Fifth Circuit decision, but neither that decision nor *Davila* itself reversed all this circuit's ERISA preemption precedent.  In *Memorial Hospital System v. Northbrook Life Ins. Co. ("Memorial I")*, 904 F.2d 236 (5th Cir. 1990), the court held that ERISA preempts state-law claims if the claim addresses areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan, and if the claim directly affects the relationship among the traditional ERISA entities—the employer, plan administrator, participants, and beneficiaries.  ERISA preempts state-law claims brought by plan participants or beneficiaries and third-party health care providers who bring derivative actions that allege improper denial of a claim for plan benefits or would have the effect of

modifying the express terms of an ERISA plan.  *Id.* at 245.  ERISA does not preempt

nonderivative state-law claims of third-party health-care providers.  *Id.*

 This court applies the applicable law to determine whether St. Luke's state-law

claims for payment as a third-party provider under a managed-care contract are properly

characterized as completely preempted claims for benefits under the Knust ERISA Plan.

## III.    Analysis

### A.    The Role of the Assignment

The first question under the *Davila* complete preemption test is whether St. Luke's

is asserting a claim that it could have brought under ERISA § 502(a)(1)(B).  *Davila*, 542 U.S.

at 210.  A hospital has standing to sue under § 502(a) as an assignee of a participant or

beneficiary in order to claim plan benefits.  *See Pascack Valley Hosp.*, 388 F.3d at 400 n.7;

*Hermann Hosp. v. MEBA Med. & Ben. Plan*, 845 F.2d 1286, 1289 (5th Cir. 1999); *City of

Hope Nat'l Med. Ctr. v. Healthplus, Inc*., 156 F.3d 223, 228–29 (1st Cir. 1998).

ERISA completely preempts state-law causes of action for plan benefits brought by

a provider as an assignee.  A health-care provider can assert a claim under § 502(a) if a

beneficiary or participant has assigned to the provider that individual's right to benefits under

the plan.  St. Luke's had an assignment of benefits from Galvan and could have sued under

section 502 of ERISA as an assignee.

The fact that Galvan assigned her benefits to St. Luke's does not fully answer the

preemption issue.  Although a hospital's claim cannot be completely preempted if it did not

receive an assignment that would give it standing to sue under ERISA, the assignment itself

19

does not result in complete preemption of the hospital's claim.[4]  *See Baylor Univ. Med. Ctr. v. Epoch Group, L.C.*, 340 F. Supp. 2d 749, 760 n.9 (N.D. Tex. 2004) ("That [plaintiff] could have sued as an assignee is not dispositive. . . . Given [plaintiff's] independent right of action as a creditor, the court will not recharacterize [it] as an assignee."); *Tenet Healthsystem Hosps., Inc.*, 2005 WL 1038072 at *3 n.3 ("That [plaintiff] may, in fact, have an assignment, is not itself dispositive, if the rights at issue are those provided by a third-party agreement, rather than an ERISA plan."); *cf. Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1289 n.13 (5th Cir. 1988) (stating that discouraging health-care providers from becoming assignees would "undermine Congress' goal of enhancing employees' health and welfare benefit coverage").

Complete preemption under § 502(a) requires both standing and the lack of an independent legal duty supporting a state-law claim.  *Davila*, 542 U.S. at 210.  A legal duty is not independent of ERISA if it "derives entirely from the particular rights and obligations established by [ERISA] benefit plans."  *Id.*; *see generally Mem'l Hermann Hosp. Sys. v. Great-West Life & Annuity Ins. Co.*, No. Civ. A. H-05-1234, 2005 WL 1562417 (S.D. Tex. June 30, 2005).  Each of St. Luke's causes of action is examined under this test.

---

[4]  *See Peninsula Reg'l Med. Ctr. v. Mid Atl. Med. Serv*s.*, LLC.*, 327 F. Supp. 2d 572, 575, 576 (D. Md. 2004) ("The 'threshold question' presented by [the *Davila*] test is whether the plaintiff has standing to sue under ERISA's civil enforcement provision. . . . Without the specific assignment of rights by a participant or beneficiary, however, this Court finds no authority to support the proposition that a third-party provider has standing to sue on its own behalf under ERISA."); *Johns Hopkins Hosp. v. Carefirst of Md., Inc.*, 327 F. Supp. 2d 577, 581 (D. Md. 2004) (citing *Davila* for the proposition that "[t]he plaintiff's standing to sue under [§ 502(a)(1)(B) ] is . . . an essential requirement in determining whether claims are preempted"); *Tenet Healthsystem Hosps., Inc.*, 2005 WL 1038072 at *3 ("Without an assignment of benefits from a 'participant' or 'beneficiary' of an ERISA plan, . . . a third-party health care provider[ ] does not have standing to assert an enforcement claims under [state law].").

### A.    The Preemption Analysis

#### 1.    The Breach of Contract Claims

St. Luke's contends that Acordia and Knust breached the managed-care contract by failing to pay claims as that contract requires.  Defendants respond that the duty to pay St. Luke's under the managed-care contract for the services provided to Galvan depends on whether those were "Covered Services" provided to an "Eligible Person," and whether a service is covered and furnished to an eligible person depends entirely on interpreting and applying the Knust Plan terms.[5]

In the present case, unlike *Pascack Valley Hospital*, *Whirley Industries*, and *Tenet Healthsystem Hospitals*, the crux of the parties' dispute is over the right to payment, not over the level, rate, or amount of payment.  Defendants did not pay St. Luke's any of the amounts billed for Galvan's care on the ground that she was not eligible for Plan benefits and the treatment she received was not a "covered service" because a preexisting condition exclusion applied.  The Plan's obligation to pay for the services St. Luke's provided Galvan depends

---

[5] Two of the parties' arguments warrant little discussion. First, Acordia asserts that because it is not a formal signatory to the managed-care contracts, those contracts cannot give rise to any independent legal duties in this case. Courts have rejected similar arguments in analyzing preemption. *See, e.g.*, *Pascack Valley Hosp.*, 388 F.3d at 400 n.8 (noting plan administrator's argument that it had no direct contractual relationship with the hospital but declining to resolve the merits of that claim ).  Moreover, the contracts cover not only entities that enter into Payor Agreements with PPO Next, but also their agents. *Cf. Baylor Univ. Med. Ctr.*, 340 F. Supp. 2d 749 at 754 (reading instruments together to find that the various managed-care contracts, including the equivalents to the Facility Service Agreement, the Payor Agreement, and the Agreement with the hospital provided a three part contractual relationship involving the hospital, the plan, the claims administrator, and the equivalent to PPO Next).

St. Luke's argues that because *Davila* involved claims by a participant and beneficiary against their ERISA plans, that case is distinguishable and does not control.  The cases since *Davila* apply its test not only to claims by participants and beneficiaries, but also to claims by third-party health care providers.  *See, e.g., Pascack Valley Hosp.*, 388 F.3d at 400 n.7; *Whirley Indus., Inc.*, 2005 WL 2335337; *Tenet Healthsystem Hosps., Inc.*, 2005 WL 1038072 *3 n.3.

on, and derives from, the ERISA Plan terms.  The crux of the dispute is over eligibility and coverage for the services rendered.  Much like *Radiology Associates of San Antonio*, determining eligibility and coverage for the services rendered in this case depends on the Knust ERISA-regulated Plan terms.  Although St. Luke's frames the breach of contract claim as a claim for breach of the managed-care contract, that claim depends on whether the Knust Plan covered the services and whether Galvan was eligible for Plan benefits or whether the preexisting condition exclusion in the Plan removed any Plan obligation to pay.  The breach of contract issue does not merely implicate the Knust Plan; rather, whether the managed-care contract was breached wholly depends on the Knust Plan.

Because the dispute is as to the right to payment as opposed to the amount or level of payment, the claim is one that a participant or beneficiary could assert and that St. Luke's could assert as Galvan's assignee.  The first prong of *Davila,* requiring that "at some point in time, [St. Luke's] could have brought [its] claim under ERISA § 502(a)(1)(B)," is satisfied.  *Davila*, 542 U.S. at 210.  Because the dispute is as to the right to payment—coverage and eligibility under the ERISA-regulated Plan terms—the claim is not based on duties that arise independently of ERISA or the Plan terms.  As the Court pointed out in *Davila*, when a managed-care entity cannot be liable under an allegedly independent legal duty for denying coverage for treatment because the ERISA health-care plan does not cover that treatment, the legal duty does not arise independently of the plan terms.  *Id.* at 213. In this case, the defendants' duty to pay St. Luke's for Galvan's treatment depends on whether the treatment was for services covered under the Knust Plan and provided to an

22

person eligible under that Plan.  "Covered Services" is defined as "the health care services provided pursuant to a plan"; "Eligible Persons" is defined as "the persons entitled to receive the Covered Services Pursuant to a Plan."  (Docket Entry No. 58, ¶¶ 2.2–2.3).  The Facility Service Agreement provides that "[a]ll payments under this Agreement are subject to all the terms, conditions, exclusions, deductibles, and coinsurance requirements of the Plan." (Docket Entry No. 58, Ex. 2.8, ¶ 2.6).[6]  The dispute in this case is whether St. Luke's had the right to be paid for Galvan's treatment because the treatment consisted of covered services provided to an eligible person, or whether St. Luke's had no right to demand payment from the defendants because the preexisting condition exclusion applied.  Interpretation of the Plan terms is essential to St. Luke's claim for breach of the managed-care contract.  Liability for breach of the managed-care contract derives from the specific rights and obligations established by the Knust Plan.  The second prong of *Davila* is satisfied.

---

[6]  *Davila* also underscored the point in terms of damage causation:

> The THCLA does impose a duty on managed care entities to 'exercise ordinary care when making health care treatment decisions,' and makes them liable for damages proximately caused by failures to abide by that duty.  § 88.002(a).  However, if a managed care entity correctly concluded that, under the terms of the relevant plan, a particular treatment was not covered, the managed care entity's denial of coverage would not be a proximate cause of any injuries arising from the denial.  Rather, the failure of the plan itself to cover the requested treatment would be the proximate cause.  More significantly, the THCLA clearly states that '[t]he standards in Subsections (a) and (b) create no obligation on the part of the health insurance carrier, health maintenance organization, or other managed care entity to provide to an insured or enrollee treatment which is not covered by the health care plan of the entity.'  § 88.002(d).  Hence, a managed care entity could not be subject to liability under the THCLA if it denied coverage for any treatment not covered by the health care plan that it was administering.

*Davila*, 542 U.S. at 212–13 (alterations and citations in original).

This result is different from that reached in *Baylor Univ. Med. Ctr. v. Epoch Group, L.C.*, No. Civ. A. 3:03-CV-2392, 2004 WL 2434290, at \*2 (N.D. Tex. Oct. 29, 2004).  After *Davila,* the *Baylor* court reexamined an earlier holding that a contract claim brought by a healthcare provider under intertwined contracts, including a subscriber services agreement, was not preempted.  The court did not consider, and the opinion does not reflect, the basis of the dispute in that case.  Although it appears that the plan did not pay the hospital for the services provided, there is no discussion as to whether the basis for the refusal was a coverage or eligibility decision turning on Plan terms, as opposed to a decision as to the amounts or level of payment based on the managed-care contract terms.  There is no discussion of the extent to which deciding the claim that the managed-care contract was breached turned on the underlying ERISA Plan terms.

The court in *Baylor* applied the *Memorial I* test from this circuit.  2004 WL 2434290, at \*2 (citing and discussing *Memorial I*, 904 F.2d at 248–50).  Under that test, this court would still find preemption of the contract claim in the present case.  Under *Memorial I*, preemption is appropriate when the state law addresses areas of exclusively federal concern, including the right to receive benefits under the terms of an ERISA plan, and when the state law directly affects or modifies the relationship among the traditional ERISA entities.  When, as here, the obligation to pay under the managed-care contract is dependent on the ERISA-regulated plan and the dispute is coverage and eligibility under that plan, the breach of contract claim addresses an area of exclusive federal concern—the right to receive benefits under the terms of an ERISA plan.  When, as here, the third-party provider's state-law

contract claim is "dependent on, and derived from, the rights of the plan beneficiaries to recover benefits under the terms of the plan," the contract claim directly affects the relationship between the plan and its participants or beneficiaries.  The result reached is consistent with both *Davila* and with *Memorial I*.

As the courts in *Pascack Valley Hospital*, *Whirley Industries*, *Tenet Healthsystem Hospitals*, *Radiology Associates of San Antonio*, and other cases recognize, when the dispute is over the right to payment, and that right depends on the ERISA-regulated Plan terms, the fact of assignment converts the hospital's claims into claims to recover benefits under the terms of the ERISA Plan.  This court concludes that it has federal removal jurisdiction because the breach of contract claim is preempted under ERISA and provides a basis for federal removal jurisdiction.

### 2.    The Statutory and Common Law Tort Claims

Although this court has supplemental jurisdiction over the remaining claims, it is appropriate to note that the label affixed to those claims does not determine whether they could independently provide a basis for removal jurisdiction.  As the court stated in *Davila*, whether a claim is labeled as a contract claim or a tort claim does not determine whether it is preempted.  *See Davila*, 542 U.S. at 215 ("[D]istinguishing between pre-empted and non-pre-empted claims based on the particular label affixed to them would 'elevate form over substance and allow parties to evade' the pre-emptive scope of ERISA simply 'by relabeling their contract claims as claims for tortious breach of contract.' ").

25

St. Luke's asserts claims for misrepresentation, in violation of Article 21.21, §§ 4 and

16 of the Texas Insurance Code and the Texas Business and Commerce Code § 17.46[7] and

---

[7]  *See* TEX. INS. CODE ANN. art. 21.21, repealed by Acts 2003, 78th Leg., ch. 1274, § 26(a)(a) (effective April 1, 2005), replaced by TEX. INS. CODE ANN. tit. 5, § 541.001 et seq. (Vernon 2004–2005). St. Luke's alleges the following violations of Article 21.21, § 4:

> (1)   Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued on the benefits or advantages promised thereby . . . ;
>
> (2)  Causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, or in any other way, a statement containing any assertion, representation or statement with respect to the business of insurance which is untrue, deceptive or misleading;
>
> (11)  [sic ] Misrepresenting an insurance policy by: (a) making an untrue statement of material fact; (b) failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made; (c) making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact; (d) making a material misstatement of law; or (e) failing to disclose any matter required by law to be disclosed, including a failure to make disclosure in accordance with another provision of this code.

St. Luke's alleges the following violations of the Texas Deceptive Trade Practices Act, for which relief is provided under Article 21.21, § 16, of the Texas Insurance Code:

> (1)  "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services"; § 17.46(b)(2).
>
> (2)   representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not; § 17.46(5).
>
> (3)  representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; § 17.46(b)(7).
>
> (4)  representing that an agreement confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law; § 17.46(b)(12).

Texas common law.  The two categories of alleged misrepresentations are the defendants' failure to inform St. Luke's during its precertification inquiry that there was a preexisting-conditions clause that would exclude coverage for the procedure Galvan received and alleged misrepresentations about the claim processing.   As to the first category of alleged misrepresentations—misrepresentation-during-precertification—*Davila* and Fifth Circuit precedent suggest that complete preemption may not apply.

In *Transitional Hospitals Corp. v. Blue Cross and Blue Shield of Texas, Inc*., 164 F.3d 952 (5th Cir. 1999), the court held that when a health care provider alleges misrepresentations relating to coverage, and there is "some coverage," preemption depends on "whether the claim in question is dependent on, and derived from the rights of the plan beneficiaries to recover benefits under the terms of the plan." *Id.* at 955.  *Davila* suggests that the state-law claims alleging common law misrepresentation and statutory misrepresentations in precertifying Galvan's procedure are not dependent on or derived from Galvan's right to recover benefits under the Knust Plan.  *Davila* discusses the source of duties breached when a managed-care entity is making a coverage determination that depends on plan terms.  The Court stated that if a managed-care entity "correctly concluded that, under the terms of the relevant plan, a particular treatment was not covered, the managed-care entity's denial of coverage would not be a proximate cause of any injuries arising from the denial.  Rather, the failure of the plan itself to cover the requested treatment would be the proximate cause." *Davila*, 542 U.S. at 214.

27

In *Children's Hosp. Corp. v. Kindercare Learning Center, Inc*., 360 F. Supp. 2d 202 (D. Mass. 2005), the court held that ERISA did not preempt a hospital's misrepresentation claims that did not require interpretation of the ERISA plan.  In that case, the Kindercare health insurance administrator retroactively cancelled a Kindercare employee's health care coverage for failure to make premium payments during her newborn child's lengthy hospital stay.  *Id.* at 204.  The employer refused to pay any of the claims.  The hospital sued the employer and plan administrators for breaching a duty owed to the hospital "by intentionally or negligently misrepresenting the existence of coverage when there was none."  *Id.* at 206. Applying *Davila*, the court held that these claims, which go to the existence of coverage, could not have been asserted under ERISA § 502 and were not preempted.  *Id.*  The court further rejected the defendants' contention that ERISA preempted the hospital's Massachusetts state-law claims for failure to disclose the insured's lapse in premium payments, misrepresentations that the hospital would be paid, and obstruction of the insured's attempt at paying the late premiums.[8]  *Id.* at 207.  The court noted that those claims could be subject to a defense of conflict preemption, but because resolution of the claim did not require ERISA Plan interpretation with certainty, complete preemption did not apply. The court remanded the case to state court.

---

[8]  "On December 17 and 18, 2003, the plan administrator informed [the hospital] that Mrs. Doe had yet to pay her premium and stated that the plan would cancel coverage of Baby Girl D retroactive to the beginning of her care with [the hospital] unless Kindercare received payment by check by the close of business the same day, December 18.  Such method of payment was impracticable, as Kindercare headquarters are in Oregon and Plaintiff is in Massachusetts.  Kindercare refused to accept payment via wire from Children's Hospital or via credit card from a friend of Mrs. Doe."  *Id.* at 204 (internal citations omitted).

St. Luke's misrepresentation-during-precertification claim alleges that even if Acordia correctly denied coverage, St. Luke's nevertheless sustained damages.  St. Luke's allegedly relied on the alleged representation in the precertification process that under the Plan, Galvan's contemplated procedure was a covered service and she was an eligible person.  The alleged damages St. Luke's sustained by treating Galvan are not properly attributed to the Knust Plan terms, which may exclude coverage or eligibility for the treatment she received, but to Acordia's alleged representation that Galvan was covered for that treatment.  In short, St. Luke's provided treatment to Galvan based on Acordia's alleged promise that St. Luke's would be compensated for its work, regardless of—not because of—the Plan's "preexisting condition" exclusion.

Put another way, Acordia's potential liability to St. Luke's for misrepresentation-during-precertification is not dependent on the Plan terms because Acordia can be liable even if it correctly denied coverage under the Plan terms.  The statutory and common-law duties allegedly breached by the representation about coverage and eligibility during precertification implicate the Plan, but do not derive from the Plan or depend wholly on the Plan terms. *See Transitional Hosps. Corp.*, 164 F.3d at 954 ("ERISA does not preempt state law when the state-law claim is brought by an independent, third-party health care provider (such as a hospital) against an insurer for its negligent misrepresentation regarding health care coverage; when there is some coverage, the court must determine whether the claim depends on the right of the plan beneficiary to recover benefits.").  The misrepresentation-during-precertification claim is not completely preempted.

29

St. Luke's also alleges that Acordia misrepresented or negligently performed the claims processing.  These claims are subject to complete preemption.  In *Davila*, the Supreme Court found that the duties imposed by state law regarding the handling of coverage decisions did not arise independently of ERISA or the terms of the plans in question.  *Davila,* 542 U.S. at 210.  The Supreme Court found that the state causes of action fell "within the scope of" ERISA § 502(a)(1)(B), and were preempted and removable to federal district court.  *Id*. at 211.  The statutory and common law claims of misrepresentations about claims processing are completely preempted.

St. Luke's asserts violations of Articles 3.70, 20A.18B, and 21.55 of the Texas Insurance Code.[9]  These provisions require insurers, including health maintenance organizations and preferred provider organizations, promptly to pay the claims of physicians and other health care providers.  *See Baylor Univ. Med. Ctr. v. Arkansas Blue Cross Blue Shield*, 331 F. Supp. 2d 502, 511 (N.D. Tex. 2004).  Article 20A.18B(c), a now-repealed part of the Texas Health Maintenance Organization Act, required an HMO to "pay the total amount of the claim in accordance with the contract between the physician or provider and the [HMO]" within forty-five days of receiving a clean claim from a physician or provider.[10]

---

[9]   *See* Tex. Ins. Code Ann. art. 20A.18B, repealed by Acts 2001, 77th Leg., ch. 1419, § 31(b)(13)-(15) (effective June 1, 2003); Tex. Ins. Code Ann. art. 21.55, repealed by Acts 2003, 78th Leg., ch. 1274, § 26(a)(1) (effective April 1, 2005); Tex. Ins. Code Ann. art. 3.70, repealed by Acts 2003, 78th Leg., ch. 1274, § 26(a)(2), (3) (effective April 1, 2005).

[10]   *Baylor*, 331 F. Supp. 2d at 511 (quoting Tex. Ins. Code Ann. art. 20A.18B(c)(1), replaced by Tex. Ins. Code Ann. tit. 6, §§ 843.338--843.3385).  Article 20A.18B further provides:

> A health maintenance organization that violates Subsection
> (c)   . .. of this section is liable to a physician or provider

Article 3.70 applies to health insurance policies that offer different benefits from the basic level of coverage for the use of preferred providers.  *Id.* (citing TEX. INS. CODE ANN. art. 3.70-3C, § 2).  The prompt payment provisions in Article 3.70-3C, § 3A, which the Texas Legislature repealed in 2005, required an insurer "[not] later than the 45th day after the date that [it] receives a clean claim from a provider to "make a determination of whether the claim is payable."[11]  Article 21.55, also repealed, provided for certain damages for breach of that duty.  *See Protective Life Ins. Co. v. Russell*, 119 S.W.3d 274, 284–85 (Tex. App. – Tyler 2003, pet. denied).

In this case, the statutory claim for violating the Texas prompt pay statute enforces rights protected by ERISA's civil enforcement provision.  *See Davila*, 542 U.S. at 210.  The ERISA Plan insuring Galvan not only provides the factual context for this claim, but also

---

for the full amount of billed charges submitted on the claim or the amount payable under the contracted penalty rate, less any amount previously paid or any charge for a service that is not covered by the health care plan.

TEX. INS. CODE ANN. art. 20A.18B(f), replaced by TEX. INS. CODE ANN. tit. 6, § 843.342 (Vernon Pamphlet 2004–2005).

[11]  Article 3.70-3C, § 3A(e) further provides:

(1) if the insurer determines the entire claim is payable, [the insurer must] pay the total amount of the claim in accordance with the contract between the preferred provider and the insurer;

(2) if the insurer determines a portion of the claim is payable, [the insurer must] pay the portion of the claim that is not in dispute and notify the preferred provider in writing why the remaining portion of the claim will not be paid; or

(3) if the insurer determines that the claim is not payable, [the insurer must] notify the preferred provider in writing why the claim will not be paid.

determines whether defendants had any obligation to pay St. Luke's for Galvan's medical care.  Because the dispute is as to the right to payment, the Texas prompt pay claim depends on the Plan terms.  The prompt-pay statutory claims are completely preempted by ERISA. *Id*.

This court concludes that there is federal removal jurisdiction based on ERISA preemption.  The motion for reconsideration is denied.

## IV.    The Motion to Dismiss the Breach of Fiduciary Duty Claim

The amended complaint alternatively asserts a state and federal breach of fiduciary duty claim.  (Docket Entry No. 32, ¶¶ 40–59).  The defendants have moved to dismiss this claim on the ground that St. Luke's lacks standing to pursue it.  (Docket Entry Nos. 36 at 3; 37).

A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982).  The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true.  *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).  The district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  This strict standard of review under Rule 12(b)(6) has been summarized as follows:  "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."  5 Charles A. Wright

32

& Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE 1357, at 601 (1969); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "In order to avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations. We will thus not accept as true conclusory allegations or unwarranted deductions of fact." *Tuchman v. DSC Comm'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) (internal citations, quotation marks and ellipses omitted). If an affirmative defense or other barred relief (such as absolute immunity or statute of limitations) is apparent from the face of the complaint, a motion under Rule 12(b)(6) should be granted. 5B  Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE Civil 3d § 1357, at 708 (2004).

Section 409 of ERISA, 29 U.S.C. § 1109(a), provides a cause of action for breach of fiduciary duty enforceable through § 502(a)(2), 29 U.S.C. § 1132(a). Section 502(a)(2) permits a civil action to be brought "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under § 1109 of this title." Section 1109 (ERISA § 409(a)) provides that a fiduciary who breaches the duties imposed by ERISA will be liable for losses to the plan resulting from those breaches. There is no individual cause of action under § 409(a) for compensatory damages. Section 409(a)'s "loss to the plan" language limits claims "to those that inure to the benefit of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985); *Matassarin v. Lynch*, 174 F.3d 549, 556 (5th Cir. 1999). An individual plan participant may not bring a private action for breach of fiduciary duty "where it is readily apparent from the complaint that a plaintiff is seeking to recover benefits under § 502(a)(1)(B)." *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*,

181 F.3d 634, 639 (5th Cir. 1999) (citing *Vanity Corp. v. Howe*, 516 U.S. 489, 510–16 (1996)).

St. Luke's cites *Ducre v. SBC-Southwestern Bell*, 402 F. Supp. 2d 766 (W.D. Tex. 2005).  (*See* Docket Entry No. 55 at 2).  In *Ducre*, the court recognized that "Section 1109 itself does not provide an independent cause of action on the part of beneficiaries for individual compensatory damages."  402 F. Supp. 2d at 771.  The court's discussion of the abuse of discretion standard went to the plaintiff's claim under § 502(a)(1)(B).  *Ducre*, 402 F. Supp. 2d at 772.  Because it is "readily apparent" from the complaint in this case that St. Luke's is seeking to recover benefits under § 502(a)(1)(B)—specifically, the benefits St. Luke's asserts defendants should have paid for Galvan's medical services under the ERISA-regulated Plan—the breach of fiduciary duty claim must be dismissed.

In its amended complaint, St. Luke's also asserts a cause of action styled, "C.F.R. Violations."  St. Luke's alleges that "Defendants' failure to provide services or provide benefit payments violates their fiduciary responsibilities under part 4 of Title 1 of ERISA" and other technical violations of the statute.  (Docket Entry No. 32, ¶ 46).  This is a mirror-image of the § 502(a)(2) claim.  St. Luke's has not introduced any support for its argument that the ERISA regulations support a private cause of action for breach of fiduciary duty beyond that available under § 502(a)(2) or, in limited circumstances, § 502(a)(3) (*see Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996)).  Because St. Luke's cannot bring a § 502(a)(2) claim, the purported "C.F.R. Violations" claim is dismissed.

**V.    Conclusion**

St. Luke's motion for reconsideration is denied.  The defendants' motion to dismiss the breach of fiduciary duty claims is granted.  An amended scheduling order will be issued separately.

SIGNED on June 8, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge