# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ST. LUKE'S EPISCOPAL HOSPITAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1438 |
| | § | |
| ACORDIA NATIONAL and | § | |
| KNUST-SBO, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

In this insurance dispute, St. Luke's Episcopal Hospital sues an ERISA plan administrator, KNUST-SBO, and the third-party plan administrator, Acordia National, for the costs of medical treatment provided to a plan beneficiary during her six-week hospital stay. Acordia denied payment on the ground that the beneficiary's treatment was for preexisting conditions and excluded from coverage. St. Luke's sued Acordia and KNUST in Texas state court, alleging state-law causes of action for misrepresentations relating to the plan benefits, negligence in precertifying coverage for the hospitalization and in investigating and processing St. Luke's payment claim; and for breach of contract in failing to pay for the services provided. This court previously denied St. Luke's motion to remand (and affirmed the denial in a memorandum and opinion denying a motion to reconsider), based on ERISA preemption. In an amended pleading, St. Luke's added an ERISA claim. The remaining

causes of action are the ERISA claim for benefits under 29 U.S.C. § 1132(a)(1)(B), asserted under an assignment of benefits from the plan beneficiary, and state-law claims for negligent misrepresentation during the precertification process.  (Docket Entry No. 62).   The parties have filed cross-motions for summary judgment as to both claims.  (Docket Entry Nos. 64, 65).

Based on a careful review of the motion, the responses, and replies, the record, the arguments of counsel, and the applicable law, this court grants defendants' motion for summary judgment and denies the cross-motion for summary judgment filed by St. Luke's as to the misrepresentation claim.  This court denies both parties' motions for summary judgment as to the ERISA claim, remanding the matter for further review by the plan administrator because Acordia's failure to comply with the procedural requirements of ERISA and the plan frustrated full and fair administrative review.  (Docket Entry No. 64). The reasons for these rulings are set out below.

## I.      The Summary Judgment Evidence

Rachel Galvan's husband was hired by KNUST on February 10, 2004.  KNUST offered a medical insurance plan (the "Plan") to its employees and their spouses.  Galvan's husband enrolled himself and his wife in the Plan on February 19, 2004.  (Docket Entry No. 65, Ex. A-3).  Their participation was effective as of February 10, 2004.

The Plan excluded coverage for preexisting conditions, as follows:

> Except as provided in subparagraph (C) below of this section, expenses incurred for treatment of a Pre-Existing Condition shall be excluded from coverage under the Plan and not considered Covered Medical Expenses if medical advice, diagnosis, care or treatment was recommended or received with respect to such Pre-Existing Condition within the six (6) month period ending on the Participant's Enrollment Dater; provided, however that such exclusion shall extend for a period of not more than twelve (12) months (or eighteen (18) months in the case of a Late Enrollee) after the Participant's Enrollment Date and the period of such Pre-Existing Condition exclusion shall be reduced by the aggregate of the periods of Creditable Coverage applicable to the Participant as of the Enrollment Date.

(*Id*. at 19).[1]  The Plan defined preexisting conditions as:

> an Injury or Sickness or any related condition present before the Enrollment Date, whether or not any medical advice, diagnosis, care of treatment was recommended or received before the Enrollment Date; provided, however, genetic information shall not be treated as a Pre-existing Condition in the absence of a diagnosis of the condition related to such information.

(*Id*. at 13).  As applied to Galvan, the preexisting conditions exclusion applied until February 10, 2005 to conditions for which she had received treatment, advice, diagnosis, or care within the six months before enrollment.  This six-month "look-back period" extended from August 10, 2003 to February 10, 2004.  St. Luke's contends that Galvan was admitted and treated for a septic knee, which was not a preexisting condition.  Acordia contends that the record shows that the principal reasons for admission and treatment were for heart conditions for which Galvan had been treated within the look-back period, along with diabetes, kidney

---

[1]Neither the creditable coverage offset nor the exceptions in subparagraph C for newborns, adopted children, and pregnancy are at issue in this case.

3

problems, and related complications.

The summary judgment evidence includes the following documents, with supporting affidavits:

• The KNUST-SBO Plan Document and documents showing Galvan's status as a beneficiary.[2]

• Records relating to the agreement between KNUST and Acordia.[3]

• St. Luke's claim, itemized bill, and financial records.[4]

• Letters sent by Acordia to Galvan's medical providers to determine whether her condition was preexisting.[5]

• Letters and records sent to Acordia by Galvan's medical providers, including an affidavit and letter from Galvan's treating physician at St. Luke's, Dr. Michele Sartori,[6] a letter from Cardio Vascular Care Providers,[7] and records from Dr. Susan Burgert at St. Luke's.[8]

• Affidavits and related materials from Acordia representatives Linda Marcum,

_____

[2]Docket Entry No. 65, Ex. A-1, Ex. D.

[3]Docket Entry No. 65, Ex. A-2.

[4]Docket Entry No. 65, Ex. C, C-1, Ex. F,  Ex. G (labeled E).

[5]Docket Entry No. 65, Ex. C-2.

[6]Docket Entry No. 65, Ex. D-4, E, F.

[7]Docket Entry No. 65, Ex. D-3.

[8]Docket Entry No. 65, Ex. D-5.

concerning a telephone conversation with St. Luke's on June 4, 2004;[9] Mary Beth Edwards, relating to claims received from St. Luke's for Rachel Galvan and the Acordia utilization review process;[10] and Terry Mace, R.N., relating to her review of records relating to treatment provided to Rachel Galvan at St. Luke's and during the look-back period.[11]

•     Affidavits and related materials from two St. Luke's representatives, Madelyn Ruiz, who conducted the precertification review into Galvan's coverage,[12] and Mark Evard, the director of patient financial services.[13]

•     A list of medical codes.[14]

•     Communications sent by Acordia to Galvan showing the status of her claim.[15]

•     Galvan's St. Luke's medical records, which were not part of the administrative record assembled by Acordia when it reviewed the benefits claim.[16]

The record also contains St. Luke's responses to Acordia's first set of interrogatories

---

[9]Docket Entry No. 65, Ex. B-1.

[10]Docket Entry No. 65, Ex. C; Docket Entry No. 66, Ex. C.

[11]Docket Entry No. 65, Ex. D.

[12]Docket Entry No. 65, Ex. H (labeled F in file).

[13]Docket Entry No. 65, Ex. B.

[14]Docket Entry No. 65, Ex. D-2.

[15]Docket Entry No. 65, Ex. C-3.

[16]Docket Entry No. 65, Exs A, B-1; Docket Entry No. 65, Ex. E (consent form), Ex. I, Ex J (discharge summary); Ex. L (diagnosis information); Docket Entry No. 66, Ex. B.

and first set of requests for production[17] and state-court pleadings related to this case.[18]

The material facts are undisputed. The record contains no evidence that Acordia received claims for medical treatment or services provided to Galvan before June 3, 2004. (Docket Entry No. 66, Ex. C at 2). On that date, Galvan was admitted to St. Luke's through the emergency room, complaining of shortness of breath, nausea, and vomiting. A St. Luke's employee, Madelyn Ruiz, called Acordia to verify Galvan's insurance benefits. (Docket Entry No. 65, Ex. H). In her affidavit, Ruiz stated that she talked to "Linda M.," who reported that Galvan was covered by the KNUST Plan with a $200 deductible and $5,000,000 in lifetime maximum coverage. (*Id*.). Ruiz provided the admitting diagnosis code for Galvan: 428.0, which is "congestive heart failure." According to Ruiz, "Linda M. did not disclose to me that Rachel Galvan's medical plan had a pre-existing condition exclusion or that Rachel Galvan's admitting diagnosis may not be covered under her medical plan due to a preexisting condition exclusion." (*Id*.). "Linda M." did tell Ruiz that the charges would be repriced and paid through the managed care agreement St. Luke's had with PPO Next. (*Id*.).

Linda Marcum, an Acordia Senior Customer Service Representative, received the June 4, 2004 call from "Madelyn" Ruiz at St. Luke's. Marcum had worked for Acordia since 1995. (Docket Entry No. 65, Ex. B). Marcum provided "general benefit information" to St.

---

[17]Docket Entry No. 65, Ex. G.

[18]Docket Entry No. 65, Ex. H; Docket Entry No. 66, Ex. A.

Luke's, including the dates and levels of coverage available.  Marcum stated that she read

the following "standard disclaimer" to Ruiz:

> Please note, this summary of benefits and/or eligibility is not a
> guaranty of payment, benefit determinations will be based on
> eligibility and plan limits at the time services are rendered.  The
> benefits information being provided to you today only applies
> to procedures and diagnoses that are covered by the plan.  We
> encourage you to review this plan's Summary Plan Description
> to determine if the charges in question are covered expenses.
> Pre-authorization for a specific diagnosis or procedure must be
> in writing.

(Docket Entry No. 65, Ex. B at 2, Ex. B-1).  Marcum did not tell Ruiz that any particular

procedure, diagnosis, or charge for Galvan was covered.  (*Id.*).  Nor did Marcum specifically

identify all coverage exclusions or exceptions set out in the KNUST Plan, including the

exclusion for preexisting conditions.  The record shows that St. Luke's did not request

"preauthorization for a specific diagnosis or procedure" in writing during Galvan's

hospitalization, which lasted from June 3 until July 16, 2004.

During Galvan's hospitalization, St. Luke's and Acordia engaged in a "utilization

review" process.  On June 10, 11, 12, 15, 19, 23, 29, July 7 and July 17, 2004, St. Luke's sent

Acordia documents showing the treatment provided to Galvan.  Acordia "recertified" the

approval of additional days of care and hospitalization.  St. Luke's asserts that Acordia did

not disclose during this utilization review process that Galvan's treatment might be subject

to a preexisting condition exclusion in her medical plan.  (Affidavit of Mark D. Evard,

Director of Patient Financial Services for St. Luke's, Docket Entry No. 65, Ex. B at 3 and Ex.

B Att. C).

Mary Beth Edwards, an Acordia "team manager" responsible for claims processing and customer service, explained in her affidavit that the Utilization Review Department reviews a medical provider's requests solely to determine the medical necessity and appropriateness of the care for the medical condition, not to determine coverage. According to Acordia, the "recerts" approved requests for extended days of hospitalization based on medical necessity, given the information about Galvan's medical condition, and did not approve coverage under the Plan for the hospitalization or treatment. (Docket Entry No. 66, Ex. C at 1–2).

In 1997, St. Luke's had entered into a Facility Service Agreement with Houston Healthcare Purchasing Organization, Inc. d.b.a. PPO Next. (Docket Entry No. 58, § 2.4). St. Luke's agreed to provide discounted rates for medical services provided to participants in ceratin plans. St. Luke's submitted bills for Galvan's treatment totaling $221,210.75 to Acordia, which forwarded the bills to PPO Next to be repriced and discounted under the Facility Service Agreement. PPO Next received the bills around August 3, 2004. PPO Next repriced the amounts billed and forwarded an invoice for $173,491.00 to Acordia.

Acordia received the repriced itemized bill and claim for services for Galvan's treatment from St Luke's on August 11, 2004. (Docket Entry No. 65, Ex. C at 1). Acordia processed the claim under the supervision of Mary Beth Edwards. (*Id*.). The claim showed that Galvan had an admitting diagnosis code for congestive heart failure and a principal

diagnosis code for rheumatic heart failure.  Acordia's practice is to base its preexisting condition determination on the admitting diagnosis and principal diagnosis.  (Docket Entry No. 65, Ex. C at 1).  In addition to the codes showing an admitting diagnosis of congestive heart failure (right failure secondary to left failure) (Code 428.00), and a principal diagnosis of rheumatic heart failure (congestive) left ventricular failure (Code 398.91), the claim identified the following other diagnosis codes:  acute renal failure (Code 584.9); disease of tricuspid (heart) valve (Code 397.9); arthropathy associated with infection of the lower leg (Code 711.06); ulcer of the lower limb (Code 707.10); protein-calorie malnutrition (Code 263.9); urinary tract infection (Code 599.0); pneumonia (Code 486); and dehydration (Code 276.5).  (*Id*.; Docket Entry No. 65, Exs. C-1, C-2).

In late August 2004, Acordia sent letters to four of Galvan's health-care providers, Dr. Mario Rubin, Cardio Vascular Care Providers, Dr. Michael Lambert, and Dr. Michele Sartori, asking for information about when the doctor had first seen Galvan, the diagnoses, treatments, and medications given and when, and the name and address of the referring physician and any physician to whom Galvan was referred.  (Docket Entry No. 65, Ex. C-2). An internal Acordia record dated September 23, 2004  stated that particular documents that had been received at that time did not provide information about Galvan's medical treatment during the look-back period.  (Docket Entry No. 65, Ex. G at 3).  On October 20, 2004, Acordia gave approval to deny the claim but noted that information on the preexisting condition had not yet been received.  (*Id*. at 4)  On October 25, 2004, Acordia sent Galvan

an "Explanation of Benefits" (EOB) that stated that the claim was denied until certain requested information had been received.  The outstanding information was described as "request was sent to doctor to determine preexisting conditions." (Docket Entry No. 65, Ex. C-3 at 2, 4).[19]  In a preprinted paragraph in small type, the EOB stated that an appeal of an adverse benefit decision for claims could be filed within 180 days.  The appeal by the Plan's Benefit Committee would be "without deference to the initial determination" and if the appeal was "based on medical judgment," would include consultation with an "appropriate health care professional."  (*Id.*).

The Plan described the "Review Procedure," as follows:

> If a claim is wholly or partially denied, the Participant or the Participant's representative may make a written request for review of the denial by submitting such request to the Human Resources Office of the Employer within sixty (60) days after notification of the claim denial.  The written request for review will be forwarded by the Human Resources Office of the Employer to the Benefit Committee for a full and fair review. A decision by the Benefit Committee concerning the claim shall be made not later than sixty (60) days after the Human Resources Office receives the request for review [absent other circumstances extending that deadline]. . . . The Benefit Committee's decision on review shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by the Participant, as well as

---

[19]St. Luke's argues that  Acordia told Galvan that Acordia was consulting a "doctor" about her claim, but never did so.  (Docket Entry No. 65 at 17).  The Explanation of Benefits stated that the "SP" code meant "REQUEST HAS BEEN SENT TO DOCTOR TO DETERMINE PREEXISTING CONDITIONS"; the Z3 code meant "CLAIM HAS BEEN DENIED UNTIL THIS INFORMATION HAS BEEN RECEIVED."  (Docket Entry No. 65, Ex. C-3 at 2).  The EOB is confusing but in context appears to mean that Acordia was waiting for responses to requests for medical information from Galvan's doctors, not that Acordia had already asked a doctor to review the claim.  (Docket Entry No. 65, Ex. C-2).

> specific references to the Plan provisions on which the decision
> is based.

(Docket Entry No. 65, Ex. A-1 at 66).

In the October 25, 2004 EOB, Acordia did not finally deny the claim.  Instead, the EOB stated that the denial was only until information from "doctor to determine preexisting conditions" had been received.  *(Id.)*.  Galvan did not receive notice when additional information was received, when a further review was conducted, or when the claim was denied.

In November 2004, Acordia asked Terry Mace, R.N., an internal medical reviewer, to determine whether Galvan's condition was preexisting and excluded from coverage. (Docket Entry No. 65, Ex. D at 1).  Mace reviewed the claim and information that Acordia had received in response to the requests it had sent.  In addition to the admitting diagnosis code and the principal diagnosis code that were on the St. Luke's claim documents,  Mace also reviewed information about Galvan from Cardio Vascular Care, from Dr. Sartori, and from Dr. Susan Burgert.  Their responses to Acordia's requests for information showed the following:

- Galvan had been seen by Dr. Susan Burgert at St. Luke's hospital on November 27, 2003.  Dr. Burgert's consultation notes described Galvan as a "diabetic patient with severe vascular disease."  According to Dr. Burgert, Galvan suffered from diabetes, peripheral vascular disease, and coronary heart disease.  She had had "bilateral lower

extremity bypasses in the past," including in 2000, and a coronary artery bypass in 1999.  In November 2003, Galvan was taking the following medications: insulin, Demadex (used to treat symptoms in patients with heart failure, renal failure, and hypertension), Zaroxolyn (prescribed for edema in connection with heart disease, renal disease, and hypertension), and aspirin (at a dose used for treatment of cardiac patients).  Galvan was seen in November 2003 for a "diabetic foot ulcer" and treated with surgical debridement or amputation.  (Docket Entry No. 65, Ex. D at 4; Docket Entry No. 65, Ex. D-5).

•   Galvan had been treated by Cardio Vascular Care Providers for a heart condition starting in January 2000.  (Docket Entry No. 65, Ex. D-3).

•   Dr. Michele Sartori's progress notes on Rachel Galvan from May 9, 2003 through February 11, 2004 showed that Galvan was taking Demadex, Aldactone (prescribed to patients with heart disease); Zaroxolyn; insulin; aspirin at a dosage consistent with treatment for cardiac patients; Klorcom for potassium deficiency; and Ultram for pain. (Docket Entry No. 65, Ex. D at 3–4; Docket Entry No. 65, Ex. D-4).

Based on Galvan's medication and treatment for diabetes, heart failure, and kidney failure during the look-back period, her history of heart problems dating back to at least 2000, and her June 2004 and August 2004 admitting and principal diagnoses of congestive and rheumatic heart failure, Mace concluded that during the look-back period, Galvan had received treatment for the conditions for which she was admitted to St. Luke's.  Mace

concluded that these were preexisting conditions excluded from coverage by the Plan terms. (Docket Entry No. 65, Ex. D at 4; Ex. G at A/K-00321).  Mace noted that "Dx 398.81 [the code for rheumatic heart failure] is an illness not considered as cured and since the patient is on cardiac medication we would also consider these as PX even though they are not specifically mentioned."  (*Id*.).

Acordia did not assemble or review Galvan's St. Luke's medical records.  St. Luke's submitted them as summary judgment evidence.  Both sides cite a few bits of information contained in these records.  St. Luke's emphasizes notes on Galvan's infected knee and the treatment provided for the infection.  (Docket Entry No. 65at 12-13).  Acordia emphasizes the patient information sheet showing that the hospital service provided was "cardiology." Dr. Sartori's discharge summary included the following discharge diagnoses:  "1) Severe volume overload secondary to decreased ejection fraction at 35 to 39% due to coronary artery disease and to tricuspid regurgitation, . . . as well as to decrease renal function due to hypertensive and diabetic nephropathy; 2) Acute over chronic renal insufficiency . . .; 3) Insulin-dependent arthritis diabetes mellitus; 4) Acute septic arthritis with methicillin-sensitive Staphlococcus aureus; 5) Severe peripheral vascular disease . . . ; 6) History of coronary artery disease. . . .; 7) Hyponatremia secondary to renal dysfunction and congestive heart failure, now partially resolved; 8) Several skin sores on the buttocks and lower back." (Docket Entry No. 65, Ex. J).  The summary states that the treatment Galvan received required controlling the knee infection and managing her congestive heart failure.   (*Id*.).

Acordia did not send Galvan a formal denial.  Indeed, the record does not include any correspondence from Acordia to Galvan following Mace's review of the charges at issue. Despite the statement in the October 25, 2004 Explanation of Benefits that the denial was only until information had been received in response to "request sent to doctor to determine preexisting condition," Acordia did not tell Galvan that it had received the information requested, what that information showed, or give her an opportunity to appeal the denial and submit additional information.  St. Luke's argues that the absence of timely or effective notice violated both ERISA and the Plan requirements.  Acordia asserts that under the Plan terms, the claim was "deemed denied" either sixty days after the claim was received (October 10, 2004) as a result of Acordia's failure to send notification of the denial on time, or within ninety days from the end of the initial sixty-day period (January 8, 2005), the extension deadline under the Plan.  (Docket Entry No. 66 at 9 n.19).  Acordia asserts that the October 25, 2004 EOB "substantially complied" with ERISA notice requirements and that Galvan did not submit any notice of an intent to appeal.

On January 13, 2005, St. Luke's counsel sent a letter by certified mail to KNUST SBO (Attn: Human Resources) and Acordia (Attn: Claims/Appeals Dept.), threatening legal action for the claim denial.  That letter stated:  "In the event that your policy/plan requires or provides for an appeal of your decision to deny all/some benefits, please accept this letter as the Hospital's formal request for an appeal of your denial."  (Docket Entry No. 65, Ex. F at 7) (emphasis in original).  St. Luke's counsel sent another copy of the letter to Acordia on

14

February 10, 2005, after Acordia advised St. Luke's that it did not have a copy of the January letter. (Docket Entry No. 65, Ex. F at 18). On March 22, 2005, when Acordia had not responded to St. Luke's letters and had not treated St. Luke's demands as requesting an appeal on Galvan's behalf, St. Luke's filed suit. (*Id*. at 29).

After filing suit, counsel for St. Luke's submitted to Acordia a letter from Dr. Sartori dated March 16, 2005. In the letter, Sartori stated that Galvan's admitting diagnosis and reason for admission were her septic knee which exacerbated her congestive heart failure. St. Luke's also submitted an August 18, 2006 affidavit from Dr. Sartori, which stated that Galvan was admitted for medical care and treatment of a septic knee but did not refer to the admitting diagnosis. Acordia has moved to strike consideration of Dr. Sartori's affidavit and letter. (Docket Entry No. 66 at 4). A court is generally limited to the record the administrator reviewed in determining whether there was an abuse of its discretion in denying the payments claimed under a ERISA plan. *Vega v. National Life Services, Inc.*, 188 F.3d 287, 299 (5th Cir. 1999). Dr. Sartori's affidavit is dated August 18, 2006 and his letter to Acordia is dated March 16, 2005, after St. Luke's had filed suit. These documents were not part of the administrative record Acordia considered in investigating Galvan's claim.

Both parties have moved for summary judgment on the ERISA and misrepresentation claims.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in

which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence."  *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III.    The ERISA Claim

St. Luke's contends that Acordia's failure to provide timely or proper notice of the claim denial and its failure to provide an appeal entitles St. Luke's to a finding that the denial of benefits was an abuse of discretion.  Acordia responds that it substantially complied with the notice requirements; that neither Galvan nor St. Luke's effectively sought an appeal; and that there was no abuse of discretion in denying benefits.

Section 1133 of ERISA states:

> In accordance with regulations of the Secretary, every employee

17

> benefit plan shall
> (1) provide adequate notice in writing to any participant or
> beneficiary whose claim for benefits under the plan has been
> denied, setting forth the specific reasons for such denial, written
> in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose
> claim for benefits has been denied for a full and fair review by
> the appropriate named fiduciary of the decision denying the
> claim.

29 U.S.C. § 1133.  Department of Labor regulations state:

> The notification shall set forth, in a manner calculated to be
> understood by the claimant--
> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the
> determination is based;
> (iii) A description of any additional material or information
> necessary for the claimant to perfect the claim and an
> explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time
> limits applicable to such procedures, including a statement of
> the claimant's right to bring a civil action under section 502(a)
> of the Act following an adverse benefit determination on review.

29 C.F.R. § 2560.503-1(g)(1) (2002).

An earlier version of DOL regulations stated that if a plan administrator or fiduciary

failed to comply with the regulatory requirements for deciding a claim, the claim was

"deemed denied" on review.  *See* 29 C.F.R. § 2560.503-1(h)(4) (1999) (amended Nov. 21,

2000).  Once a claim was "deemed denied" on review, a claimant could file an action for

benefits under ERISA Section 502(a) in the district court.  The revised version of that

regulation removed the "deemed denied" provision of the earlier regulation and replaced it

with the current paragraph (l), which states:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l) (2002).

"When a claim for benefits is denied, the claimant must be furnished a written notice that sets forth particular information in a manner that the claimant can understand." *Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 255 (5th Cir. 2005). "[F]or purposes of triggering an ERISA appeal period, an initial denial notice that is in substantial compliance with the statute and the regulation will suffice." *Id*. at 256–57 (pre-2002 claims); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392 (5th Cir. 2006) (post-2002 claims). Other circuits also apply the substantial compliance standard to ERISA denials, both before and after the 2002 regulation changes. *See McCarthy v. Natl City Corp*, 419 F.3d 437 (6th Cir. 2005); *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 108 (2d Cir. 2003); *White v. Aetna Life Ins. Co.*, 210 F.3d 412, 414 (D.C. Cir. 2000); *Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997); *Kinkead v. SW Bell Corp. Sickness & Accident Disability Benefit Plan*, 111 F.3d 67, 69 (8th Cir.1997); *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807-08 (6th Cir.1996); *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 127 (4th Cir.1994); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir.1992).

In *Lacy*, the notice provided to the plan participant stated that her claim was denied

because of the preexisting condition and another exclusion.   The denial notified the participant that she had 90 days to appeal the decision and outlined the procedures for doing so.   (Civil Action No. 3-3877, Docket Entry No. 16 at 3).   The letter "explained in straightforward prose why her claim was denied."   (*Id.* at 7.)   That letter said:

> Information gathered during our investigation supports that you were prescribed Coumadin and Captopril by Dr. Strickman on January 6, 200 to treatment [sic] Congestive Heart Failure (CHF) and Cardiomyopathy.   You were prescribed Cozar and Coumadin by Dr. Strickman on April 20, 2000 for the same conditions.   These dates fall within the pre-existing periods for the UnumProvident's policy. . . .
>
> Based on our review, the utilization of Coumadin which were [sic] taken for CHF, contributed to the CVA for which you have filed a long-term disability claim.   Since this was within both the pre-existing periods indicated above, we must deny any liability on your claim.

(*Id.* at 7–8).   The letter quoted the preexisting condition and continuity of coverage plan provisions.   (*Id.* at 8).   The district court found that the letter substantially complied with the ERISA requirements, and the Fifth Circuit affirmed.   *Lacy v. Fulbright & Jaworski*, 405 F.3d at 255.

The EOB sent to Galvan in this case is substantially less detailed, clear, or definite than the letter the plan participant in *Lacy* received.   The EOB placed codes by claimed expenses and in a footnote gave the following explanation of the codes:

> SP REQUEST WAS SENT TO DOCTOR TO DETERMINE PREEXISTING CONDITIONS
> Z3 CLAIM HAS BEEN DEEMED DENIED UNTIL THIS INFORMATION HAS BEEN RECEIVED

20

12 FOR BASIS OF THIS DETERMINATION SEE PAGE 12
OF YOUR SUMMARY PLAN DESCRIPTION.

(Docket Entry No. 65, Ex. C-3 at 2).  The "Summary Plan Description" does not appear to

be part of the summary judgment record.

In a preprinted paragraph in small type, the October 25, 2004 EOB stated that the

participant could appeal an "adverse benefit decision" by filing a written appeal within 180

days.  (Docket Entry No. 65, Ex. C-1 at 2; Docket Entry No. 65, Ex. A-1 at 65).  In larger

type, the EOB  provided a 1-800 number, an address and a website "if you have any

questions."  (Docket Entry No. 65, Ex. C-3).  The EOB did not state that the claim was

finally denied or that an adverse benefit decision had in fact been made.  The EOB merely

stated that the claim was denied until information in response to "request . . . sent to doctor

to determine preexisting conditions" had been received.  (*Id.*).  As noted, Galvan did not

know, and Acordia did not notify her, when the information was received, what it said, or

what Acordia's final decision was.

The October 25, 2004 EOB did not provide the "specific reasons for such denial,

written in a manner calculated to be understood by the participant."  The EOB merely stated

that Acordia was examining the claim to determine if it was for preexisting conditions.  The

EOB did not identify what condition(s) were preexisting.  Unlike the denial notice in *Lacy*,

which disclosed the basis for the administrator's conclusion that the benefits were excluded

because they were for a preexisting  condition, including what the preexisting condition was

21

and the part of the policy that excluded the preexisting condition, Galvan's October 25, 2004

EOB offered no explanation.  Acordia did not notify Galvan when her benefits were denied.

Acordia did not tell Galvan what preexisting condition formed the basis of the denial.

Acordia did not tell Galvan what evidence it relied on to conclude that she had a preexisting

condition.

Acordia asserts that the initial coverage evaluation to determine whether Galvan's

condition was preexisting was completed by Mace, who started her review after the EOB was

sent to Galvan.  (Docket Entry No. 66 at 7).  Acordia's October 25, 2004 EOB cannot be a

notice of Acordia's denial of the claim because it was issued before Acordia had made the

evaluation or the decision.  A letter "cannot satisfy ERISA's notice requirement to provide

a 'specific' reason for the denial of benefits because it was written before [a participant's]

benefits were denied."  *McCartha v. National City Corp.*, 419 F.3d 437, 445–47 (6th Cir.

2005).  The October 25, 2004 EOB was not a denial of benefits, but merely an explanation

that Acordia was waiting for more information.  Acordia failed to notify Galvan when it

received that information or that it had made a final decision to deny the benefits.  Acordia

did not substantially comply with the ERISA notice requirement.

Galvan did not have notice that would trigger her obligation to appeal the denial of

benefits.  Although a plan administrator is not required to accept a third-party health care

provider's demand letter as a notice of appeal on behalf of or as an assignee of a plan

participant, the result of Acordia's failure to give Galvan proper or timely notice was to

deprive Galvan and her assignee of the administrative appellate review required under the Plan and ERISA.

District court determinations of medical plan benefits are disfavored. *Bourgeois v. Pension Plan for Employees of Santa Fe Intl Corps.*, 475 F.3d 475, 482 (5th Cir. 2000). Rather, when a plan administrator has failed to comply with the procedural requirements of section 503, it is ordinarily appropriate to remand the case to the plan administrator for further review. *See Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006) ("Generally, an administrator's failure to comply with ERISA procedural requirements can result in a remand by the reviewing court to the administrator."); *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1035 (9th Cir. 2006) ("[T]he usual remedy for a violation of § 1133 is 'to remand to the plan administrator so the claimant gets the benefit of a full and fair review.'") (citing *Syed v. Hercules Inc.*, 214 F.3d 155, 162 (3d Cir.2000)); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003); *Marks v. Newcourt Credit Company, Inc.*, 342 F.3d 444, 461 (6th Cir. 2003); *Weaver v. Phoenix Home Life Mutual Ins. Co.*, 999 F.2d 154, 159 (4th Cir. 1993).

A failure by a plan administrator to comply with the regulatory requirements governing ERISA claims procedures does not entitle St. Luke's to damages or to a finding of abuse of discretion. "The fact that the plan administrator failed to provide the adequate procedures does not mean that the claimant is automatically entitled to benefits—such a holding might provide the claimant with an economic windfall should she be determined not

23

disabled upon a proper reconsideration." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003) (citations omitted).

Nor does Acordia's failure to meet the procedural requirements of ERISA and the Plan trigger a *de novo* review of the claim denial. *See Southern Farm Bureau v. Moore*, 993 F.2d 98, 99 (5th Cir. 1993). In that case, a plan administrator investigated the claim and concluded that the loss was excluded by the policy terms. The administrator did not formally notify the employee of its decision, as the regulation required. Instead, the administrator sought a declaratory judgment in federal court that it did not have to pay benefits under the plan. *Id.* at 99–100. Because the administrator had failed to provide the employee with the requisite written notice of its decision to deny her claim, the district court reviewed its factual determinations under a *de novo* standard of review. On appeal of a jury verdict in favor of the employee, the administrator argued that the district court erred in failing to review its factual determinations for abuse of discretion. The Fifth Circuit held that the administrator's findings of fact should have been reviewed for abuse of discretion. *Id.* at 100–01. The court noted that the purpose of the "deemed denied" provision of the applicable Section 2560.503-1 was to permit a claimant to bring an action in the district court when an ERISA administrator simply fails to decide a claim on the merits. *Id.* at 101. The *Moore* court went on to hold that the administrator's failure to provide the employee with written notice of its decision did not affect the applicable standard of review. "In our view, the standard of review is no different whether the claim is actually denied or deemed denied. The role of the

district court is the same in either event. . . ." *Id.* (footnote omitted).

In *Goldman v. Hartford Life and Acc. Ins. Co.*, 417 F. Supp. 2d 788 (E.D. La. 2006), the court thoroughly analyzed the case law before and after the changes to Section 2560.503-1 and concluded that *Moore* should be read more narrowly.  *Moore* was not a case in which the administrator simply failed to act on a claim.  The administrator in that case investigated the claim, made factual determinations about the cause of the loss, and decided that the loss was excluded under the policy terms.  The procedural breakdown in *Moore* was that, once the administrator decided to deny the employee's claim, rather than sending the employee written notice of the denial, the administrator sought a declaratory judgment of nonliability. The administrator actually exercised its discretion and made factual findings about the employee's claim, but failed to comply with the regulation's notice procedures.  "The question actually presented to the Fifth Circuit was, therefore, whether to grant deference to the factual findings that the administrator actually made during its investigation, or whether *de novo* review was required because of the administrator's procedural error.  The Fifth Circuit held that, because the district court's task, reviewing the factual determinations that the administrator made at the conclusion of its investigation, was the same whether or not the administrator complied with the regulation's notice requirement, there was no reason to alter the standard of judicial review."  *Goldman*, 417 F. Supp. at 801.

In this case, as in *Moore*, the plan administrator did not fail to make a decision on the claim.  Instead, Acordia made a decision to deny the claim but failed to comply with the

25

requirements for notice and with the requirements for a full and fair review of the claim denial. Remand to permit a full and fair administrative review of the claim denial is appropriate.

This court denies both St. Luke's and Acordia's motions for summary judgment on the ERISA claims. This claim will be remanded to allow a review by the Plan Benefit Committee in accordance with ERISA and the Plan requirements. The parties must adhere to the applicable procedures and time limits. Under the Plan terms, Acordia must notify Galvan (and St. Luke's, her assignee), of the result of the administrative review. The parties must notify this court of the Plan administrator's decision no later than 30 days after it is issued. If St. Luke's wishes to seek review from this court, it may ask this court to reinstate the case on the active docket within 30 days after the administrative review is concluded.

## IV.    The Negligent Misrepresentation Claim

Under Texas law, to recover for negligent misrepresentation, St. Luke's must prove that (1) Acordia made a representation in the course of its business, or in a transaction in which it had a pecuniary interest, (2) Acordia supplied false information for the guidance of Methodist in its business, (3) Acordia did not exercise reasonable care or competence in obtaining the information, and (4) St. Luke's suffered pecuniary loss by justifiably relying on the representation. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 318 (5th Cir.2002) (applying Texas law). The parties have filed cross-motions for summary judgment on the negligent misrepresentation claim.

26

Acordia points to summary judgment evidence that, when St. Luke's contacted it on June 3, 2004, its representative stated accurately that Galvan was covered under the Plan, subject to a deductible and copayment requirement. Acordia also points to evidence that its representative did not state that the Plan would pay St. Luke's for services rendered to Galvan regardless of the Plan's limitations and exclusions. To the contrary, the evidence shows that Marcum (for Acordia) specifically told Ruiz (for St. Luke's) that the summary of benefits was not a guaranty of payment, that benefits determinations were based on eligibility and Plan benefits when the services were provided, and that the benefits information only applied to procedures and diagnoses covered by the Plan. (Docket Entry No. 65, Ex. B). St. Luke's does not contend that Acordia represented that the Plan would pay St. Luke's for services rendered to Galvan regardless of the Plan's limitations and exclusions.

St. Luke's does contend that in this initial contact, Acordia should have advised that the claim might be subject to the preexisting condition exclusion. St. Luke's contends that when Acordia received the admitting diagnosis and "authorized 39 days and gave SLEH an authorization number of 466980420 pending clinical," (Docket Entry No. 65 at 24), the authorization was in itself a representation of payment. The basis for this contention is the allegation that "Acordia knew from previous claims submitted by Mrs. Galvan or her medical providers that she had a history of heart and kidney problems prior to her admission to [St. Luke's]. Upon [St. Luke's] providing Acordia with an admitting diagnosis that may possibly be excluded, Acordia owed a duty to disclose such to [St. Luke's]." (Docket Entry No. 65

27

at 24).  The record shows that the first claim Acordia received on Galvan's behalf was from St. Luke's on June 3, 2004.  There is no evidence to raise a fact issue that Acordia knew of any preexisting condition when Galvan was hospitalized.

In *Provident American Ins. Co. v. Castaneda*, 988 S.W.2d 189, 200 (Tex. 1998), an insurance carrier preapproved a beneficiary's medical procedure but later denied the claim because it found that the condition had manifested within 30 days after the policy went into effect and was not covered.  The Texas Supreme Court found when the preapproval was issued, the insurance company lacked critical information about whether the condition was covered, making the preapproval "an uninformed conclusion."  988 S.W.2d at 200.  The Texas Supreme Court ruled that in the context of the DTPA, "pre-approval does not constitute a false, misleading, or deceptive act; a misrepresentation of the terms of an insurance policy; or an assertion with respect to insurance that was untrue."  *Id.*  "[The plaintiff's] position, if accepted, would impose strict liability on carriers that are not given pertinent facts before a procedure is pre-approved and who later learn that they have a good faith, reasonable basis for denying coverage."  *Id.*  Here, as in *Provident American Insurance*, Acordia authorized the hospital stay on the basis of the information then available, without guaranteeing coverage.

St. Luke's argues that through the utilization review process, Acordia negligently misrepresented that the services provided to Galvan were covered.  St. Luke's asserts that as Acordia reviewed  the "clinicals" that were sent periodically during Galvan's stay, Acordia

should have "disclosed to [St. Luke's] that there may be a preexisting condition exclusion and that the benefits as represented may not be paid." (Docket Entry No. 65 at 24; Ex. B). The undisputed evidence is that the utilization review process at Acordia was limited to checking whether the services provided were medically necessary. (Docket Entry No. 66 at 1). This process did not attempt to determine whether the services or diagnoses were covered under the Plan terms. Moreover, the "clinicals" sent showed the treatment that Galvan was receiving at St. Luke's, not what treatment she had recieved during the lookback period. The evidence specifically cited by St. Luke's does not show that during the utilization review process, Acordia received information about what treatment Galvan had received during the look-back period, which was critical to determining whether the hospital expenses were for preexisting conditions.

The record does not raise a fact issue as to whether Acordia misrepresented coverage to St. Luke's. Nor does the record raise a fact issue as to whether St. Luke's justifiably relied on the representation, given the undisputed evidence as to the detailed disclaimer given by Marcum. *See Bonilla v. Principal Financial Group*, 281 F. Supp.2d 1106 (D. Ariz. 2003)( "the Bonillas provide no basis for the Court to find that Principal's provision of a pre-authorization number indicated that Principal had already assessed the implications of Mrs. Bonilla's disclosed, preexisting condition."); *cf. Methodist Hospitals of Dallas v. Wal-Mart Stores, Inc.*, 2003 WL 21266775 (N.D. Tex. 2003) (finding fact issue because the evidence as to whether the insurer gave a disclaimer during a precertification telephone call

was disputed and at most showed that the disclaimer was limited to a prerecorded statement that "[t]he following information is not a guarantee of payment" before being transferred to a customer service representative);

Acordia's motion for summary judgment on the negligent misrepresentation claim is granted; the cross-motion filed by St. Luke's is denied.

## V.   Attorneys' Fees

Acordia has asked this court for attorneys' fees in this case.  (Docket Entry No. 64 at 19).  Under ERISA § 502(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  In *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.1980), the court outlined five factors:

> 1. The degree of the opposing parties' culpability or bad faith;
> 2. The ability of the opposing parties to satisfy an award of attorneys' fees;
> 3. Whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;
> 4. Whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant question regarding ERISA itself; and
> 5. The relative merits of the parties' positions.

*Riley v. Administrator of Supersaver 401K Capital Accumulation Plan*, 209 F.3d 780, 781–82 (5th Cir. 2000).  Given the finding as to the procedural deficiencies in the claims handling and the resulting remand, the request for fees is denied at this time.

## VI.   Conclusion and Order

Acordia's motion for summary judgment is granted as to the negligent

misrepresentation claim; the cross-motion filed by St. Luke's is denied.  The motion and cross-motion are denied as to the ERISA claim.  Acordia's motion for attorney's fees is denied.  (Docket Entry No. 64).

The ERISA benefits claim is reinstated and remanded to the Plan administrator to allow a review by the Plan Benefit Committee in accordance with ERISA and the Plan requirements.  The parties must adhere to the applicable procedures and time limits.  Acordia must notify Galvan (and St. Luke's, her assignee), of the result of the administrative review. This case will be administratively closed pending the outcome of the remand to the Plan administrator.  The parties must notify this court of the Plan administrator's decision no later than 30 days after it is issued.  If St. Luke's wishes to seek review from this court, it may ask this court to reinstate the case on the active docket within 30 days after the administrative review is concluded.

SIGNED on February 13, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

31